# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>HARLEY-DAVIDSON, INC., )<br>HARLEY-DAVIDSON MOTOR COMPANY )<br>GROUP, LLC, )<br>HARLEY-DAVIDSON MOTOR COMPANY, )<br>INC., and )<br>HARLEY-DAVIDSON MOTOR COMPANY )<br>OPERATIONS, INC., )<br>)<br>Defendants. )<br>_____ ) | Case No. 1:16-CV-1687 (EGS) |

**EXHIBIT C**
**U.S. ENVTL. PROT. AGENCY, SECURING MITIGATION AS INJUNCTIVE RELIEF**
**IN CERTAIN CIVIL ENFORCEMENT SETTLEMENTS (2ND ED. 2012)**



UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
WASHINGTON, D.C. 20460

NOV 1 4 2012

OFFICE OF
ENFORCEMENT AND
COMPLIANCE ASSURANCE

**MEMORANDUM**

**SUBJECT:**   Securing Mitigation as Injunctive Relief in Certain Civil Enforcement Settlements (2nd edition)

**FROM:**   Susan Shinkman, Director
Office of Civil Enforcement

**TO:**   Regional Counsels
Regional Enforcement Division Directors
Regional Enforcement Coordinators
Office of Civil Enforcement Division Directors

A.   PURPOSE

To ensure that EPA's environmental enforcement efforts not only correct and deter illegal conduct but maximize the redress of its consequences, this memorandum is intended to strongly encourage case teams to seek mitigation, where appropriate, as a component of the injunctive relief they seek in civil judicial enforcement cases.[1] An analysis of whether mitigation is appropriate should be a key part of case development. Where case teams determine it is appropriate, they should develop evidence to support its pursuit, in settlement and in cases that ultimately proceed to trial.

To aid case teams, this memorandum provides a definition of mitigation and guidance for use in determining when mitigation is an appropriate and desirable remedy and how to negotiate its terms. It also discusses the legal bases for mitigation and clarifies the differences between mitigation and Supplemental Environmental Projects (SEPs).[2]

B.   INTRODUCTION

In settlement of certain civil environmental enforcement cases,[3] consent decrees negotiated by EPA and Department of Justice (DOJ) typically include injunctive relief obligations to ensure that defendants'

---

[1] This memorandum and any internal procedures adopted for its implementation are intended solely for employees of EPA, do not constitute Agency rulemaking, and may not be relied on to create a right or benefit, substantive or procedural, enforceable at law or in equity, by any person. The Agency may take action at variance with this memorandum and its internal implementing procedures.

[2] SEPs are environmentally beneficial projects that a defendant agrees to undertake in the settlement of an enforcement action, but which the defendant is not otherwise legally required to perform. EPA's inclusion of SEPs in enforcement settlements is governed by EPA's Final Supplemental Environmental Projects Policy, effective May 1, 1998 (EPA Final SEP Policy).

[3] This memorandum is not meant to address mitigation with respect to or to alter EPA's current practice under the following authorities: the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C § 9601-9675; the Resource Conservation and Recovery Act (RCRA) Section 3008(h), 42 U.S.C. § 6928(h); RCRA Section 7003, 42 U.S.C. § 6973; RCRA Section 9003(h), 42 U.S.C. § 6991b(h); Clean Water Act (CWA) Sections 311(c) and 311(e), 33

future operations are in compliance with the law. Such relief is often in the form of physical improvements and/or operational changes at a facility that will ensure prospective compliance with applicable requirements, such as air emission or wastewater discharge limits.

However, at least one other form of injunctive relief is available to the government under appropriate circumstances: relief requiring a defendant to remedy, reduce or offset harm caused by past or ongoing violations. This relief is often referred to as "mitigation" or "mitigation actions."[4] This memorandum focuses on the most common cases in which mitigation should be considered to address harm to human health or the environment caused by excess emission or unauthorized/noncompliant discharge violations.[5]

Although mitigation is rooted in the same injunctive power from which courts derive their authority to order future compliance, mitigation is fundamentally different. Mitigation is not focused on preventing future violations and does not require proof that a defendant is currently violating the law. Rather, mitigation is intended to redress harm. As discussed below, the government's entitlement to this relief flows from the inherently broad equitable authority of the district courts, and it is supported by federal case law interpreting the statutory authorities in the environmental statutes that EPA enforces.[6]

WHAT IS MITIGATION?

1. Definition

Mitigation is injunctive relief sought by the government to remedy, reduce or offset past (and in some cases ongoing) harm caused by the alleged violations in a particular case. As noted above, such harm is generally found where excess emissions or discharges harmed human health, wildlife or the environment. Mitigation is distinguishable from other injunctive relief obligations, such as those that ensure a defendant's operations come into and remain in compliance with applicable laws and regulations. A mitigation action is one that provides identifiable benefits by accomplishing results such as the following:

- Cleaning up illegally emitted or discharged pollutants from the environmental media affected by the violation;
- Limiting the amount of future pollutants emitted or discharged (more stringently than legal limits) to address past excesses;

---

U.S.C. §§ 1321(c) and 1321(e); and CWA Section 404, 33 U.S.C. § 1344. Questions regarding CERCLA, these RCRA provisions, and CWA Section 311 should be directed to the Office of Site Remediation Enforcement and to the Office of Civil Enforcement as appropriate. For further discussion of CWA Section 404, see Section C.1 *infra*.

[4] Over the last few years, several terms have been used to describe this type of injunctive relief. These terms include "mitigation project," "mitigation action" or simply "mitigation." To reduce the potential for confusion with Supplemental Environmental Projects (SEPs), this memorandum refers to such relief as "mitigation" and/or "mitigation actions," but does not use the term "mitigation project."

[5] This guidance is intended to address mitigation in cases involving violations that result in excess emissions or unauthorized/noncompliant discharges. We recognize that mitigation may be appropriate in additional settings – such as cases involving violations that do not give rise to illegal emissions or discharges or cases involving environmental harm in the absence of violations (e.g., imminent and substantial endangerment cases). We reserve for future discussion the factors to consider in determining the propriety of mitigation in those additional settings. In the meantime, please contact the appropriate OECA office, either OSRE or OCE, if you have questions regarding mitigation in these contexts.

[6] *See* Section D.

- Addressing the impacts on human health, wildlife or the environment from the excess emissions or unauthorized or noncompliant discharges related to the violation;[7] or

- Monitoring designed to determine, and inform the community about, the level and extent of pollution emitted or discharged from a facility.

As noted in footnote 3, this memorandum is not intended to alter EPA's current practice under CWA Section 404, 33 U.S.C. § 1344, where the United States already routinely seeks restorative measures. Under CWA Section 404, EPA has long advocated that unauthorized or noncompliant discharges are continuing violations for which removal of the discharged pollutants is an appropriate injunctive remedy to bring a party into compliance.

In the CWA Section 404 context, injunctive relief aimed at remediating the specific harm caused by the violation is known as "restoration." In evaluating CWA Section 404 violations, wetlands enforcement staff consider the discharge's adverse impacts to determine whether on-site restoration is required. If a discharge would not have qualified for a Section 404 permit, EPA's preference is to require full on-site restoration for the impacts. If the discharge would have qualified for a full or partial permit, partial restoration with compensatory mitigation may be appropriate. Compensatory mitigation may also be appropriate when meaningful restoration is not a viable option. Additionally, such mitigation is sometimes sought in addition to full on-site restoration as compensation for temporal losses. Case teams enforcing CWA Section 404 should refer to the September 29, 1999, memo, "Injunctive Relief Requirements in Section 404 Enforcement Action," from Eric Schaeffer, Director of the Office of Civil Enforcement (the Schaeffer memo), rather than this memorandum, for specific guidance regarding injunctive relief in the Section 404 context.[8]

2. How Mitigation Differs from SEPs

There are three significant differences between mitigation actions and SEPs: the legal bases for EPA's ability to include one or the other in settlement; the requirements for nexus to the underlying violations; and the impacts on the size of civil penalties. Case teams should remain mindful of these key differences.

First, mitigation is action the government believes a court could order as injunctive relief if a case were litigated, and that the United States would be prepared to seek in court if the defendant were unwilling to settle the case. EPA's ability to obtain mitigation in settlement is based on the likelihood that, in litigation, the United States could establish mitigation was needed to redress past or ongoing harm to the environment and public health. A SEP, on the other hand, is a voluntary project that results from negotiation between the parties and cannot be secured outside the settlement context. As voluntary

---

[7] For example, to address the impacts of Clean Water Act violations resulting in loss of fish, a mitigation action might provide for the restocking of fish in the water body.

[8] The Schaeffer Memo emphasizes EPA's preference for on-site restoration of impacts that would not have qualified for a Section 404 permit, and notes that, "the complete restoration of such waters should be sought except in limited circumstances . . . ." The memo defines those circumstances in which mitigation in lieu of on-site restoration may be considered, including circumstances: "(1) where substantial or meaningful restoration is not ecologically possible or when restoration attempts may cause more ecological harm than compensatory mitigation . . . (2) when there is no practicable way to require restoration . . . and (3) where the property is now owned by a good-faith purchaser and the equities strongly favor allowing the new owner to retain the fill." It also notes that "the 'temporal loss' of a functioning system must be compensated."

projects, SEPs, and the reduced civil penalty demand associated with them, are within EPA's prosecutorial discretion so long as each SEP approved by EPA comports with the SEP Policy.

Second, since the purpose of mitigation is to, as nearly as possible, restore the *status quo ante*, there must be a closer connection between a mitigation action and the harm it redresses than the nexus required by the SEP Policy. For example, in a case involving illegal sulfur dioxide emissions, an appropriate mitigation action could aim to reduce sulfur dioxide emissions (or sulfur dioxide precursors) below legal limits to offset the past illegal excess emissions. SEPs, on the other hand, are aimed at achieving more broadly-defined environmental or public health benefits, and are not solely limited to redressing the specific harm caused by the violations. Under the SEP Policy, nexus also exists where the proposed project is designed to reduce the overall likelihood that similar violations will occur and/or where the overall risk to public health or the environment potentially affected by the violation is reduced. EPA Final SEP Policy at C.1. Thus, while there must be a nexus between the violations and any SEP, the nexus need not be as direct as that required by mitigation.

Using the illegal sulfur dioxide emissions example, a SEP might provide focused monitoring stations at a facility's perimeter to help inform the public of the facility's emissions.[9] Importantly, because they are not aimed at ameliorating a specific impact, SEPs are potentially available in almost any type of case, especially where it is more challenging to identify a specific redressable harm or the relevant statute does not provide adequate injunctive authority.

Third, unlike an agreement to perform a SEP, a defendant's agreement to perform mitigation does not entitle it to a civil penalty reduction. Of course, in any settlement, the government must evaluate all of the defendant's commitments in light of the government's litigation risks. Accordingly, a defendant's agreement to perform mitigation may factor into the government's analysis of whether a particular civil penalty is one the government should accept.[10]

As a result of these three key differences between mitigation and SEPs, the same action should never be considered both a mitigation action and a SEP in the same case. A mitigation action must be one the case team believes a court would be willing to order the defendant to perform if the case were litigated to redress the specific harm caused by the violations. The SEP Policy itself reflects this requirement, specifying that a project cannot qualify as a SEP where a particular project is one the case team believes the court could order as injunctive relief.[11]

However, depending on the facts, the same type of activity could constitute mitigation in one case and a SEP in another. For example, a judge might order a defendant to provide diesel school bus retrofits as a mitigation action in a case involving excess emissions of the pollutants that would be reduced by the retrofits. In contrast, in a case involving failure to perform required testing for diesel-related pollutants in which EPA has no evidence of excess emissions that would require mitigation, the same retrofit project might be more appropriate, and more likely to be approved by a court in a settlement, as a SEP. In developing a settlement, case teams should not bypass consideration of whether a particular action is suitable as mitigation and proceed straight to consideration of the proposed action as a SEP simply

---

[9] Of course, in a different case, a fenceline monitoring project such as this might be appropriate as mitigation rather than as a SEP.

[10] *See* Section E.3. However, while litigation risks may factor into the analysis, the case team should not, for example, press for mitigation where it may not be warranted and then accept a reduced penalty because of the associated litigation risk. Mitigation should only be sought where it is warranted.

[11] *See* Final SEP Policy, Note 3.

4

because a defendant may be more willing to agree to perform the action due to potential penalty reduction. If an action is appropriate as mitigation in the case and the defendant does not agree to perform it as mitigation, then the case team must decide whether to litigate or settle without the action, but cannot simply obtain the same project as a SEP. This general rule does not preclude reconsideration of whether a project previously sought by the case team as mitigation is more appropriately considered as a SEP in cases when the reconsideration is prompted by some other changed circumstance (such as additional fact development at a later stage in the case). And, of course, where the case is not suitable for mitigation or where certain mitigation actions have already been included, the case team may consider whether other projects qualify as SEPs in accordance with EPA's SEP Policy. Case teams should never assume that because an action was acceptable as mitigation or a SEP in one case, it will be appropriate to treat it in the same way in another case with different facts or circumstances. Rather, potential mitigation actions should be evaluated on a case-by-case basis with a two-prong inquiry:

1. Is mitigation warranted in this case (*i.e.*, have the violations in this case resulted in harm that can be redressed) and would a court order such relief; and

2. Can this project be tailored to effectively redress the violations' harm?[12]

If the answer to both questions is yes, the case team should seek a project as mitigation. If the answer to either question is no, the case team should evaluate the project to determine if it meets the SEP Policy and could proceed as a SEP.

### C. LEGAL BASES FOR MITIGATION ACTIONS

Mitigation derives from courts' authority to employ all equitable remedies necessary to achieve complete justice. This fundamental principle derives from the English common law tradition and is a long-standing element of American legal doctrine. Where the public interest is involved, a court's equitable authority is curtailed only by a clear signal from Congress. *See, e.g., United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 496 (2001) ("For several hundred years, courts of equity have enjoyed sound discretion to consider the necessities of the public interest when fashioning injunctive relief.") (internal citations and quotations omitted); *Franklin v. Gwinnett County Pub. Schools*, 503 U.S. 60, 66-67 (1992); *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946) (Unless specifically curtailed by Congress, "all the inherent equitable powers of the District Court are available for the proper and complete exercise of [its equitable] jurisdiction.").

The language in various statutes that EPA enforces supports the argument that Congress did not intend to strip the courts of this equitable power. For example, the CAA states that a district court "shall have jurisdiction to restrain such violation, to require compliance, to assess such civil penalty, to collect any fees owed the United States under this chapter (other than subchapter II of this chapter) and any noncompliance assessment and nonpayment penalty owed under section 7420 of this title, *and to award any other appropriate relief.*" 42 U.S.C. § 7413(b) (emphasis added). The CWA authorizes courts to "restrain" violations and "require compliance," while RCRA authorizes EPA to "commence a civil action in . . . district court . . . for appropriate relief" for violations of RCRA. *See* CWA Section 309(b), 33 U.S.C. § 1319(b) (2011) and RCRA Section 3008(a)(1), 42 U.S.C. 6928(a)(1) (2011).

---

[12] *See* Section E.1. for a more thorough discussion of whether mitigation is warranted and whether a proposed action is appropriate.

A number of courts have held that such language in the statutes EPA enforces authorizes mitigation in appropriate cases. *See, e.g., U.S. Pub. Interest Research Group v. Atlantic Salmon of Maine, LLC*, 339 F.3d 23, 31 (1st Cir. 2003) (court's equitable power to enforce the CWA includes power to provide remedies for past violations); *United States v. Deaton*, 332 F.3d 698, 714 (4th Cir. 2003) (holding that the district court has authority under the CWA to order "remediation" in federal enforcement actions); *United States v. Holtzman*, 762 F.2d 720, 724-25 (9th Cir. 1985) (holding that CAA grant of jurisdiction to "restrain violations" includes power to enjoin otherwise lawful activity where necessary and appropriate to correct or dissipate harmful effects of past violations); *United States v. Cinergy Corp.*, 582 F. Supp. 2d 1055 (S.D. Ind. 2008) (holding that Section 113 of the CAA authorizes mitigation);[13] *United States v. Alcoa*, 98 F. Supp. 2d 1031, 1039 (N.D. Ind. 2000) (holding that CWA authority to "require compliance" is broad enough to include cleanup of contaminated sediments under certain circumstances); and *United States v. Outbound Marine Corp.*, 549 F. Supp. 1036 (N.D. Ill. 1982)(holding that CWA authorization for EPA to seek "appropriate relief" is broad enough to include clean up orders). Thus, mitigation is an important aspect of the relief that a court may order to ensure that a violation is restrained, compliance is achieved and the public interest is served.

### D. NEGOTIATING MITIGATION

#### 1. Considerations When Determining Whether Mitigation is Appropriate in a Given Case

Whether to seek mitigation and what sort of project is appropriate are fact-dependent inquiries to be made on a case-by-case basis. At a minimum, every case team must assess two threshold considerations when determining whether mitigation is appropriate for a particular case. Even then, additional considerations are relevant to deciding whether to pursue mitigation, and, if so, what sort of mitigation may be warranted.

##### a. Threshold Considerations

First, mitigation is an appropriate settlement component when a violation resulted in a harm that can be effectively redressed. As noted, such harm most often involves violations that resulted, or likely resulted, in excess emissions/discharges that affected human health or the environment. For example, the 2011 Tennessee Valley Authority (TVA) CAA settlement included $350 million of tailored mitigation actions (reducing 30,000,000 tons of carbon dioxide emissions; 96,000 tons of sulfur dioxide emissions; 25,000 tons of nitrogen oxide emissions; and 800 pounds of mercury emissions) to provide redress for excess emissions from coal-fired units at nine TVA plants (TVA had not obtained required preconstruction permits and installed and operated the necessary pollution control technology).[14]

Second, the case team must consider whether there are mitigation actions that can be suitably tailored to effectively address the harm caused by the violations. Since states often have developed local projects

---

[13] In *Cinergy*, the most recent case to examine the United States' authority to obtain mitigation as injunctive relief, the precise question presented was whether the equitable jurisdiction granted by the Clean Air Act "authorize[d] the district court to take actions to remedy, mitigate and offset the harm to public health and the environment cause by the established CAA violations." 582 F. Supp. 2d at 1058. The district court extensively analyzed the body of case law concerning federal courts' inherent equitable powers and their invocation or restriction by statute, with particular emphasis on the cases examining provisions of the CWA and CAA cited above. The court concluded, consistent with these cases, that the CAA's "equitable authority includes the granting of retrospective remedial relief." *Id.* at 1066.

[14] Consent Agreement and Final Order Docket No. CAA-04-2010-1528(b). Additional details concerning this settlement are available at http://www.epa.gov/compliance/resources/cases/civil/caa/tvacoal-fired.html.

which could serve as effective mitigation actions in a particular case, case teams should consult with affected states whenever appropriate. Case teams should also recognize that a mitigation action need not completely redress the harm caused by the violation.[15] For example, to partially mitigate the effects of acid rain resulting from excess emissions, EPA's settlement of CAA violations at Duke Energy's Gallagher Power Plant included a $250,000 mitigation payment to the U.S. Forest Service for restoration at six downwind national forests injured by excess power plant emissions.[16]

### b. Other Considerations

Other important factors that case teams should consider in determining whether and what mitigation to seek in a particular case include the extent of harm the violations caused; the characteristics of the impacted area and community; the potential for increased resource burdens in preparing the case, as well as those associated with monitoring compliance with the settlement; and an overall assessment of any litigation risk associated with pursuing the violations or the contemplated mitigation actions. This factor is discussed in detail in Section E.3.

The amount of illegal pollution and the severity of public health, environmental or other impacts should always be considered when deciding how critical it is to include mitigation in a particular settlement's injunctive relief package. Case teams should assess these facts in every case and avoid reliance on "rules of thumb" because the extent of harm in each specific case has a direct bearing on the need for mitigation and the likelihood of obtaining this sort of injunctive relief. Case teams should not seek mitigation that is out of proportion to the harm.

Notably, mitigation actions can play an important role in cases that raise environmental justice concerns because mitigation, by definition, addresses some of the harm caused by the violations and the concomitant burden associated with that harm. Executive Order 12898 "Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations" acknowledges the concern that certain segments of the nation's population are disproportionately burdened by pollutant exposure. Requiring mitigation for communities with environmental justice concerns can help lessen the burden on people who spend time in, or depend on food and water sources near, the area where environmental violations occurred. Mitigation is also a way to address concerns about cumulative impacts; even if the illegal pollution from a particular violation may appear to have a small impact on the community, community overburden is an important factor to consider. Case teams should consider, given the nature of particular violations, whether mitigation designed to offset past impacts to environmental justice communities can be identified.

Case teams should also recognize that pursuing mitigation has the potential to create significant additional agency resource burdens, such as the need for expert opinions and more detailed analyses of environmental harm and/or public health effects, and can substantially increase the length and complexity of settlement discussions. It also has the potential to create post-settlement burdens associated with monitoring compliance during implementation. Each of these factors should be taken into account.

---

[15] Across media, there are various methods and models used to quantify excess emissions and to estimate anticipated future reductions, and EPA is continually improving its approaches to such calculation. Case teams should rely on the best, most current methods applicable to the violations in a particular case and should consider consultation with EPA's program offices to ensure they are employing EPA's best tools.

[16] *United States v. Cinergy Corp.*, Civil Action No. 1:99-cv-01693-LJM-JMS (S.D. Ind. 2009). For further information regarding this settlement, *see* http://www.epa.gov/compliance/resources/decrees/civil/caa/dukeenergy-cd.pdf.

Timing of Discussions

Mitigation should be discussed concurrently with all other elements of injunctive relief. Delaying discussion of mitigation actions until other injunctive relief is already negotiated permits a defendant to develop an expectation about compliance costs that may adversely affect its willingness to undertake mitigation without additional concessions from the government.

In addition, case teams should not begin to assess or discuss SEPs until later in negotiations – until the case team either identifies and pursues mitigation actions or determines that a case is not suitable for mitigation. Negotiating all of the injunctive relief, including mitigation actions, before consideration of SEPs helps to ensure that the case team appropriately differentiates mitigation actions from SEPs. As discussed above in Section C.2., what distinguishes a mitigation action from a SEP is not necessarily the kind of project, but the circumstances of the case.

### 3. Potential Effect on Penalties

As also discussed above in Section C.2., in general, a defendant's willingness to undertake mitigation does not justify a reduction in the civil penalty the government would otherwise demand in settlement. Mitigation is, by definition, work the government believes a defendant could be compelled to perform as a result of its violations, even in the absence of a settlement. A defendant's willingness do what could be legally required does not entitle a defendant to penalty reduction, and case teams should not indicate that performing a mitigation action will lead to a reduced civil penalty.

Case teams should rely on EPA's penalty policies, which guide the proper exercise of EPA's enforcement discretion in arriving at an appropriate settlement penalty. The policies take into account many factors, including those specifically identified in the statutes. The CAA Stationary Source Penalty Policy, for example, provides for reductions in the gravity-based penalty based upon the degree of cooperation demonstrated by the defendant. Thus, a defendant's willingness, especially if demonstrated early in the negotiations, to perform certain mitigation actions as part of a settlement package might provide a rationale for some reduction in the gravity-based penalty.

However, as discussed in Section C.2., case teams must evaluate all of the defendant's commitments in light of the government's litigation risks. Even where a case team has determined that mitigation is warranted, a particular case may still present litigation risks, such as proving a defendant's underlying liability, persuading a court that it is within the court's equitable discretion to order mitigation, or proving a degree of harm that supports mitigation. Since litigation risk always factors into the government's analysis of whether a particular settlement package is in the government's interest, a case team may decide, in light of the risks, that other aspects of the settlement, including the mitigation action, are sufficiently important that it is willing to accept a smaller civil penalty in order to conclude the settlement and avoid those litigation risks.

### 4. Mitigation Action Settlement Terms

In consent decrees, mitigation actions should be addressed as part of the injunctive relief sections of the decree. To avoid unwarranted confusion with SEPs, care should be taken in drafting to avoid linking the performance of the mitigation action with any reduction or mitigation of civil penalties, and to use the terms "mitigation" and "mitigation action," rather than "mitigation project."

The consent decree should address mitigation consistently with other material terms of injunctive relief and include requirements such as: full completion of the mitigation action; a prohibition on netting

8

credits or offsets in CAA settlements; stipulated penalties; incorporation of terms into permits; and *force majeure* and similar provisions.

Finally, as with all settlements, the government should be mindful of fiscal law constraints that prohibit constructive receipt of funds by EPA or any other federal agency lacking statutory gift authority to accept donations of funds, goods or services,[17] as well as ethics regulations that prohibit improperly endorsing or providing preferential benefits to particular firms.[18] Under the settlement agreement, EPA may not play a role in managing or controlling the mitigation action; selecting, recommending, or exercising control over any third party contractor the defendant uses to carry out the action; or directing the funds used to provide the injunctive relief. Case teams may, however, review and approve the qualifications of contractors the defendant selects if they use transparent, objective criteria. In addition, to avoid any augmentation of government resources, the mitigation described in the consent decree cannot involve actions that are already the responsibility of a federal agency to perform.

For questions about this memorandum or examples of settlements that include mitigation, contact Beth Cavalier at (202) 564-3271 or Jeanne Duross at (202) 564-6595.

cc:  Cynthia Giles, OECA
     Lawrence Starfield, OECA
     Steven Chester, OECA
     Scott Fulton, OGC
     Avi Garbow, OGC
     Steven Pressman, OGC
     Kenneth Redden, OGC
     Deputy Regional Counsels
     Pamela Mazakas, OCE
     John Fogarty, OCE
     Deputy and Associate Division Directors, OCE
     Caroline Makepeace, OCE
     Elliott Gilberg, OSRE
     Ken Patterson, OSRE
     Karin Leff, OSRE
     Bruce Gelber, DOJ
     Ben Fisherow, DOJ
     Karen Dworkin, DOJ
     John Sither, DOJ

---

[17] *Compare In re Olin Corporation*, 7 Op. O.L.C. 36 (1983) (holding that a settlement agreement requiring defendant to establish health care program as a form of injunctive relief did not violate the Miscellaneous Receipts Act (MRA), 31 U.S.C. 3302(b), where the government helped design the project, but did not designate the recipient of the project), *with In re Steuart Transportation Company*, 4B Op. O.L.C. 684 (1980) (holding that a settlement in which the government designated a third party recipient of settlement proceeds amounted to constructive receipt of the funds in violation of the MRA).
[18] *See* Standards of Ethical Conduct for Employees of the Executive Branch, 5 C.F.R. Part 2635, which prohibit the improper endorsement and conferral of preferential economic benefits to a particular firm in violation of the impartiality and misuse of position provisions contained therein.

credits or offsets in CAA settlements; stipulated penalties; incorporation of terms into permits; and force majeure and similar provisions.

Finally, as with all settlements, the government should be mindful of fiscal law constraints that prohibit community receipt of funds by EPA or any other federal agency lacking statutory gift authority to accept donations of funds, goods or services,[11] as well as ethics regulations that prohibit improperly endorsing or providing preferential benefits to particular firms.[12] Under the settlement agreement, EPA may no play a role in managing or controlling the mitigation action, selecting, recommending, or exercising control over any third party contractor the defendant uses to carry out the action, or directing the funds used to provide the injunctive relief. Case teams may, however, review and approve the qualifications of contractors the defendant selects if they use transparent, objective criteria. In addition, to avoid any appropriation of government resources, the mitigation described in the consent decree cannot involve actions that are already the responsibility of a federal agency to perform.

For questions about this memorandum or examples of settlements that include mitigation, contact Beth Cavalier at (202) 564-2771 or Jeanne Dubois at (202) 564-6595.

cc:  Cynthia Giles, OECA
     Lawrence Starfield, OECA
     Steven Chester, OECA
     Scott Fulton, OGC
     Avi Garbow, OGC
     Steven Pressman, OGC
     Kenneth Redden, OGC
     Deputy Regional Counsels
     Pamela Mazakas, OCE
     John Fogarty, OCE
     Deputy and Associate Division Directors, OCE
     Caroline Makepeace, OCE
     Elliott Gilberg, OSRE
     Ken Patterson, OSRE
     Karen Leal, OSRE
     Bruce Gelber, DOJ
     Ben Fisherow, DOJ
     Karen Dworkin, DOJ
     John Sither, DOJ

---

[10] Compare In re Olin Corporation, 7 Op. O.L.C. 36 (1983) (finding that a settlement agreement requiring defendant to establish health care program as a form of injunctive relief did not violate the Miscellaneous Receipts Act (MRA), 31 U.S.C. § 3302), where the government helped design the project, but did not designate the recipient of the proceeds), with In re Seaway Production Company, 4B Op. O.L.C. 684 (1980) (holding that a settlement in which the government designated a third party recipient of settlement proceeds amounted to compensative receipt of the funds in violation of the MRA).

[11] See Standards of Ethical Conduct for Employees of the Executive Branch, 5 C.F.R. Part 2635, which prohibit the improper endorsement and conferral of preferential economic benefits to a particular firm in violation of the impartiality and misuse of position provisions contained therein.

9