**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>v.<br><br>HARLEY DAVIDSON, INC., *et al.*,<br><br>              Defendants. | No. 16-cv-1687(EGS) |

**MEMORANDUM OPINION**

Pending before the Court is the United States' Motion to Enter Consent Decree ("Consent Decree Mot."). The proposed consent decree lodged with the Court resolves claims the United States asserts against the defendants (collectively, "Harley-Davidson") for certain violations of the Clean Air Act ("CAA"), 42 U.S.C. §§ 7521 *et seq*. Three amici curiae, a group of state and local governments ("SLG"), the Natural Resources Defense Council and Conservation Law Foundation ("CLF/NRDC"), and the Sierra Club oppose the entry of the consent decree. Upon careful consideration of the motion, the arguments of Harley-Davidson and amici curiae, the relevant law, and for the reasons set forth below, the Court **GRANTS** the United States' motion.

# I. Background

## A. Factual

The complaint alleges three types of CAA violations by the defendants: (1) "Harley-Davidson manufactured and sold 12,682 motorcycles that were not certified by the [Environmental Protection Agency ("EPA")] as required by the Act"; (2) "Harley-Davidson manufactured and sold over 339,392 'Super Tuners' in violation of the Act's 'defeat device' prohibition"; and (3) "Harley-Davidson's sale of the Super Tuners caused 339,392 violations of the Act's 'tampering' provision." United States' Motion to Enter Consent Decree ("Consent Decree Mot."), ECF No. 7 at 3. Super Tuners, among other things, increase the power and performance of motorcycles. *Id*. at 6.

With respect to the first type of violation, applicable provisions of the CAA and its implementing regulations "prohibit[] manufacturers of new motor vehicles from selling, offering for sale, and introducing or delivering for introduction into commerce such vehicles unless they are covered by a Certificate of Conformity ("COC") issued by EPA." *Id*. at 4. The complaint alleges that Harley-Davidson sold 12,682 new motorcycles that were not covered by a COC. *Id*.

With respect to the second type of violation, applicable provisions of the CAA "prohibit[] any person from manufacturing, selling, offering for sale, or installing, any part or component

2

(referred to generally as a 'defeat device') where a principal effect of the [defeat device] is to bypass, defeat, or render inoperative any device or element of design installed on or in a vehicle/engine in compliance with [applicable] regulations . . . ." *Id*. at 5. The United States explains that the installation of a defeat device "undermines the whole certification program[] because the vehicle is no longer in a configuration that has been demonstrated to meet emission standards." *Id*. The complaint alleges that Harley-Davidson's manufacture and sale of the Super Tuners resulted in at least 339,392 violations of the CAA's defeat device prohibition. *Id*. at 6.

With respect to the third type of violation, applicable provisions of the CAA prohibit the "tampering" with "any device or element of design installed on a motor vehicle in compliance with the regulations promulgated under" the applicable provisions of the CAA. *Id*. The complaint alleges that Harley-Davidson violated the tampering provision by selling the Super Tuners and that its "actions caused the installation of at least 339,392 [Super] Tuners in violation of the CAA's tampering provision." Id. at 7. The government explains that such tampering results in increased emissions. *Id*. at 8.

**B. Procedural**

On August 18, 2016, the United States filed a three-count complaint against Harley-Davidson, alleging violations of the CAA. *See generally* Compl., ECF No. 1. On that same date, it lodged a consent decree that had been agreed to and signed by all parties. Notice of Lodging of Consent Decree, ECF No. 2. The Court refers to this consent decree as the "superseded consent decree." The government requested that the Court take no action pending publication of the consent decree in the Federal Register and the running of the comment period, stating that it would advise the Court of any action that may be required. *Id.* at 1. Thereafter, on July 20, 2017, the United States filed a new consent decree, ECF No. 6, and following publication in the Federal Register and the running of the comment period, the government on December 11, 2017 moved for an Order Entering Consent Decree. *See* Consent Decree Mot., ECF No. 7. The Court refers to the new consent decree as the "consent decree" or "decree." The consent decree is identical to the superseded consent decree except that it no longer contains a mitigation project. Amici oppose entering the consent decree because it no longer contains that project nor an alternative mitigation project.

**C. Consent Decree**

The consent decree requires Harley-Davidson to:

> (1) Cease manufacturing, selling, and/or distributing for use in the United States any Tuning Product that has` not been authorized by the California Air Resources Board ("CARB") or the EPA. Harley-Davidson has reported that it has met this requirement;

> (2) Offer to buy back Super-Tuners supplied to its dealers but not yet sold to the ultimate purchaser, and to destroy the illegal Tuners bought back. Harley-Davidson has reported that it has met this requirement;

> (3) Deny warranty claims (and instruct its dealers to do so as well) where the claim is for a functional defect for a motorcycle tuned by a Tuning Product described in paragraph (1);

> (4) For sales abroad, mark uncertified Tuning Products as "Not Authorized For Use In, Or Export To, The United States or its Territories" and to agree to a reporting and tracking system allowing EPA to monitor whether Harley-Davidson sells large quantities of the uncertified Tuning Products to Canada and Mexico so that U.S. Citizens could purchase them there and bring them back to the U.S.;

> (5) Conduct annual tailpipe emissions tests on motorcycles that have been modified with its most popular certified "kit" (tuning product combined with aftermarket part(s));

> (6) Obtain an EPA-issued COC before selling, offering for sale, importing, introducing, or delivering for introduction into commerce a new motorcycle;

> (7) Report semi-annually to assist the EPA in monitoring compliance;

(8)   Pay   stipulated   penalties   for   decree
violations; and

(9)   Pay a civil penalty of $12 million.

Consent Decree Mot., ECF No. 7 at 9-12.

The consent decree does not contain a mitigation project
that would have required Harley-Davidson to pay $3 million to
non-party The American Lung Association of the Northeast
("ALANE") "to mitigate emissions of hydrocarbons and oxides of
nitrogen by replacing old, higher polluting woodstoves with
emissions-certified wood stoves." *Id*. at 2. On June 5, 2017,
when the superseded consent decree was pending, and before the
United States moved for its entry, the-then Attorney General
issued a new policy entitled *Prohibition on Settlement Payments
to Third Parties* ("Third-Party Payment Policy" or "Policy")
which prohibits, except for a payment that "directly remedies
the harm that is sought to be redressed, including, for example,
harm to the environment," Department of Justice "attorneys from
entering into a civil or criminal settlement that 'directs or
provides for a payment or loan to any non-governmental person or
entity that is not a party to the dispute.'" United States'
Resp. to Br. by Amici Curiae Opposed to the Consent Decree
("Resp."), ECF No. 16 at 6 (quoting Third-Party Payment Policy
at 1). The United States explains that after this policy was
issued, it became concerned about the inclusion of the

6

mitigation project in the superseded consent decree, sought to
renegotiate it, but was unable to negotiate an acceptable
revised or alternative project with Harley-Davidson. Consent
Decree Mot., ECF No. 7 at 14-15.

The United States notes that it held a 30-day public
comment period on the consent decree, received comments which it
carefully considered, and concluded that none of the comments
provides a basis for withholding its consent to the entry of the
decree. *Id*. at 3.

## II.  Standard for Entry of Consent Decree

The "generally applicable" standard for the review of a
consent decree in the District of Columbia Circuit is whether
the consent decree "'fairly and reasonably resolves the
controversy in a manner consistent with the public interest.'"
*Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1206 n.1 (D.C.
Cir. 2004) (quoting *New York v. Microsoft Corp.*, 231 F. Supp. 2d
203, 205 (D.D.C. 2002)) (citing *Citizens for a Better Env't v.
Gorsuch*, 718 F.2d 111, 1126 (D.C. Cir. 1983)). "'[P]rior to
approving a consent decree a court must satisfy itself of the
settlement's overall fairness to beneficiaries and consistency
with the public interest.'" *Citizens for a Better Env't*, 718
F.2d at 1126 (internal quotation marks and citation omitted).

"'Approval of a settlement is a judicial act that is
committed to the informed discretion of the trial court.'"

7

*United States v. Hyundai Motor Co.*, 77 F. Supp. 3d 197, 199
(D.D.C. 2015) (quoting *U.S. v. District of Columbia*, 933 F.
Supp. 42, 47 (D.D.C. 1996)). The Court is not to "substitute its
judgment" for that of the parties to the decree and "may not
modify but only approve or reject a consent decree." *United
States v. Akzo Coatings of America, Inc.*, 949 F.2d 1409, 1435
(6th Cir. 1991). "Naturally, the agreement reached normally
embodies a compromise; in exchange for the saving of cost and
elimination of risk, the parties each give up something they
might have won had they proceeded with litigation." *United
States v. Armour & Co.*, 402 U.S. 673, 681-82 (1971).

   "The trial court in approving a settlement need not inquire
into the precise legal rights of the parties nor reach and
resolve the merits of the claim or controversy, but need only
determine that the settlement is fair, adequate, reasonable and
appropriate under the particular facts and that there has been
valid consent by the concerned parties." *Citizens for a Better
Environment*, 718 F.2d at 1126 (citing *Metropolitan Housing
Development Corp. v. Village of Arlington Heights*, 616 F.2d
1006, 2014 (7th Cir. 1980)). "[I]t is precisely the desire to
avoid a protracted examination of the parties' legal rights
which underlies consent decrees. Not only the parties, but the
general public as well, benefit from the saving of time and
money that results from the voluntary settlement of litigation.

Thus, '[v]oluntary settlement of civil controversies is in high judicial favor.'" *Id.* (quoting *Autera v. Robinson,* 419 F.2d 1197, 1199 (D.C. Cir. 1969)). That said, "[a] decree, even entered as a pretrial settlement, is a judicial act, and therefore the district judge is not obliged to accept one that, on its face and even after government explanation, appears to make a mockery of judicial power." *Microsoft Corp.*, 56 F.3d at 1462. "Finally, broad deference should be afforded to EPA's expertise in determining an appropriate settlement and to the voluntary agreement of the parties in proposing the settlement." *District of Columbia,* 933 F. Supp. at 48 (citing *In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 118 (2d Cir. 1992)).

## III. Analysis

The Court must determine whether the government has met its burden to demonstrate that the consent decree is fair, reasonable and in the public interest. *United States v. Davis*, 11 F. Supp. 2d 183, 189 (D.R.I. 1998) ("The United States is obliged to proffer sufficient facts and reasons to establish that these factors have been satisfied and that approval is warranted.").

**A. The Consent Decree is Fair**

"A review of the fairness of a proposed consent decree requires an assessment of the good faith of the parties, the opinions of the counsel, and the possible risks involved in litigation if the settlement is not approved." *District of Columbia*, 933 F. Supp. at 48 (quoting *United States v. Hooker Chem. & Plastics Corp.*, 607 F. Supp. 1052, 1057 (W.D.N.Y. 1985)). "Fairness incorporates both procedural and substantive components." *United States v. Telluride Co.,* 849 F. Supp. 1400, 1402 (D. Colo. 1994). "An assessment of procedural fairness involves looking 'to the negotiating process and attempt[ing] to gauge its candor, openness, and bargaining balance.'" *District of Columbia*, 933 F. Supp. at 47 (quoting *Telluride Co.,* 849 F. Supp. at 1402). "A consent decree that is substantively fair incorporates 'concepts of corrective justice and accountability: a party should bear the cost of harm for which it is legally responsible.'" *Id.* at 47 (*quoting United States v. Cannons Eng'g Corp.,* 899 F.2d 79, 87 (1st Cir. 1990)).

The United States argues that the process was adversarial, that the United States is the enforcer of the CAA and Harley-Davidson vigorously defended itself, and that the parties negotiated for over a year. Consent Decree Mot., ECF No. 7 at 15. Furthermore, the United States argues, both sides were represented by experienced counsel and technical staff and

10

accordingly were fully equipped to determine the strengths and litigation risks of their respective positions. *Id*. at 16.

The United States argues that the "settlement is substantively fair because it imposes an appropriate civil penalty and require[s] Harley-Davidson, an industry leader, to stop selling the illegal Tuners and to implement the other elements of a comprehensive, nationwide program of compliance measures." Consent Decree Mot., ECF No. 7 at 17. Thus, according to the United States, it holds the defendants appropriately accountable for their violations of law. *Id.*

Regarding the mitigation project, the United States states that "[a]fter the parties were unable to reach agreement on an alternative to the [mitigation] project, the United States considered whether it was better to proceed with the consent decree without the woodstove project or to forgo settling the case and, instead, proceed to litigate its claims against Harley-Davidson." *Id*. Considering the litigation risks and delays as compared with the injunctive relief and civil penalty, all of which was immediately obtainable, the United States decided to move forward with the revised consent decree. *Id*.

SLG argues that the consent decree is procedurally unfair because the dealings that resulted in the elimination of the mitigation project "lacked adversarial vigor" since "[t]he United States obtained nothing of value in exchange for

11

eliminating the $3 million mitigation project." Br. of State and
Local Gov't Amici in Opp'n to United States' Mot. to Enter
Consent Decree ("SLG Br."), ECF No. 12 at 26.[1]

There is nothing in the record to suggest that the removal
of the mitigation project was the result of any collusion
between the parties. Rather, the United States in its discretion
determined that the Third-Party Payment Policy prohibited the
inclusion of the project and approached Harley-Davidson to
renegotiate that aspect of the consent decree. When the parties
were unable to reach an agreement on an alternative to the
mitigation project, the United States determined that settling
the case without that provision—but going forward with the
injunctive relief and civil penalty—was preferable to forgoing
settling it and taking on the litigation risks that would
result. Given the narrow scope of this Court's review, the Court
cannot say that the United States' assessment was unreasonable.
*United States v. Chevron*, 380 F. Supp. 29 1104, 1112-13 (N.D.
Calif. 2005). Furthermore, understood in this light, it is
apparent that the government *did* get something in return for the

---

[1] SLG complains that the United States provided no details nor
declarations to support its assertion that the process was
adversarial. SLG Br., ECF No. 12 at 25. However, SLG points to
no authority indicating that the provision of such declarations
is required, and is able to cite only two examples where
declarations were provided.

removal of the mitigation project after the policy change—it
settled the case, obtained injunctive relief, and obtained a
civil penalty.

Next, SLG argues that the consent decree is procedurally
unfair because the United States did not consult with the states
regarding the removal of the mitigation project. SLG Br., ECF
No. 12 at 26. However, SLG concedes that there is no "absolute
requirement that the United States allow the States or other
third parties to participate directly in negotiations with a
defendant." SLG Br., ECF No. 12 at 30. There is no indication
that the United States' decision not to consult with the states
was done in bad faith. *United States v. Cannons Eng'g Corp.*, 899
F.2d 79, 93 (1st Cir. 1990) ("So long as it operates in good
faith, the EPA is at liberty to negotiate the settlement with
whomever it chooses."). This is especially so given that the
record does not indicate that the states were consulted
regarding the superseded consent decree.

Finally, SLG argues that the consent decree is procedurally
unfair because "the United States failed to . . . adequately
respond to comments and consider reasonable alternatives to the
mitigation project" submitted in response to the consent decree.
SLG Br., ECF No. 12 at 26. The record indicates that during the
30-day public comment period, comments were received objecting
to the removal of the mitigation project and suggesting

alternative projects. Consent Decree Mot., Ex. 1, ECF No. 7-1 at
13-60. The record further shows that the United States did not
substantively respond to those comments because they did not
address the provisions of the consent decree lodged with the
Court. Consent Decree Mot., Ex. 2, ECF No. 7-2 at 2-10.

The Court takes into consideration the United States'
failure to address the comments objecting to the removal of the
mitigation project and suggested alternatives. Although the
United States asserts a rationale for not responding to the
comments objecting to the removal of the mitigation project from
the consent decree, the United States should have done so. *See
Akzo Coatings of America, Inc*., 949 F.2d at 1435 ("The good
faith efforts of the parties to the decree are evidenced by the
voluminous record, the arms-length negotiation process and the
manifested willingness of EPA to thoroughly consider all oral
and written comments made with regard to the proposed decree.").
But the Court cannot find that this failure, without more,
renders the decree procedurally unfair.

This is even more so because the Court has considered the
comments and amici make many of the same arguments in the
briefing before this Court. *See United States v. City of
Waterloo*, 2016 WL 254725 at *6 (N.D. Iowa Jan. 20, 2016)
("courts must take under serious consideration any comments
received during [the public comment] period"). The Court has

also considered the United States' detailed responses to the
comments that were received in the proceeding before this Court.
*See* Consent Decree Mot., ECF No. 7 at 19 (disagreeing with
commenters' assertions that mitigation is a required element of
a settlement); 20-23 (disagreeing with commenters who asserted
that the settlement does not adequately compensate the public or
provide adequate punishment because the mitigation project was
removed); 24 (disagreeing with commenters who argued that the
penalty was too low); 27-32 (responding to objections to the
removal of the mitigation project).

    With regard to considering reasonable alternatives to the
mitigation project, SLG argues that it would have been "simple"
to have ensured that the mitigation project did not run afoul of
the Third-Party Payment Policy by requiring that the mitigation
funds be spent nationwide, *id*. at 27; and propose a number of
alternatives to the mitigation project, *id*. at 17-29. The United
States notes that it "undertook significant efforts to negotiate
with Harley-Davidson to modify the proposed woodstove project or
agree upon an alternative project that would redress the harm
from Harley-Davidson's violations in a manner that did not run
afoul of the Policy . . [but] the parties were unable to reach
agreement on a revised or alternative mitigation project."
Consent Decree Mot., ECF No. 7 at 31. The United States points
out that "[it] cannot unilaterally dictate the terms of

settlement; both parties must agree." *Id.* at 31 n.18. The
adoption of the Third-Party Payment Policy clearly put the
United States at a bargaining disadvantage when it sought to
renegotiate the mitigation project, but the Court cannot find
that this renders the consent decree procedurally unfair given
that the United States determined that the policy applied to the
decree.

NRDC/CLF argues that the consent decree is procedurally
unfair for a number of reasons. First, NRDC/CLF argues that the
government gave contradictory reasons for the removal of the
mitigation project, asserting that the government first delayed
seeking entry of the consent decree because of public comments
received, later conceded that the mitigation project was omitted
due to concerns about whether it would be barred by the Third-
Party Payment Policy, but now claiming that the initial delay
was unrelated to the issuance of that policy. Br. of Amici
Curiae Natural Resources Defense Council and Conservation Law
Foundation in Opp'n to Mot. for Entry of Consent Decree
("NRDC/CLF Br."), ECF No. 15 at 12-13. NRDC/CLF, however,
misunderstands the relevant portion of the record in this case.
On December 11, 2017, the Court granted the United States'
request for an extension of time to serve the Complaint until 30
days after such time, if any, that: (1) the Court disapproves a
motion by the United States for entry of a consent decree; or

(2) the United States notifies the Court that it no longer supports the entry of a consent decree. Minute Order (Dec. 12, 2017). The United States has consistently stated that the mitigation project was removed because of the Third-Party Payment Policy.

Next, NRDC/CLF argues that the Third-Party Payment Policy does not apply to the mitigation project, a position they assert is confirmed by a January 9, 2018 Memorandum from the Acting Assistant Attorney General providing guidance to attorneys in the Environment and Natural Resources Division of the Department of Justice ("ENRD Memorandum") in implementing the policy. NRDC/CLF Br., ECF No. 15 at 13-14. SLG and Sierra Club also argue that the Third-Party Payment Policy does not apply to the mitigation project. Specifically, SLG argues that the Third-Party Payment Policy does not prohibit the mitigation project and that the removal of the mitigation project is inconsistent with EPA policy. SLG Br., ECF No. 12 at 19-23. Sierra Club argues that the Third-Party Payment Policy does not apply to the superseded consent decree, and even if it did, the mitigation project falls within an exception to that policy. Br. of Amicus Curiae Sierra Club in Opp'n to the United States' Mot. to Enter the Proposed Consent Decree ("Sierra Club Br."), ECF No. 14 at 23-25.

The United States responds that it properly applied the Third-Party Payment Policy to remove the mitigation project because the superseded consent decree included a third-party payment covered by the Policy—specifically payments by Harley-Davidson to non-party ALANE, Resp., ECF No. 16 at 8; and that the mitigation project did not fall within the policy's limited exception for payments that "directly remedy the harm" because the alleged harms are widely dispersed throughout the United States, whereas ALANE operates only in the Northeast and the project would likely have been performed in only one state, *id.* The United States further argues that guidance in the ENRD Memorandum reinforces the conclusion DOJ had reached earlier because, among other things, it provides that "excess emissions nationwide could be addressed through a project that addresses the relevant harm in areas in multiple regions of the United states, or that otherwise would make widely distributed areas eligible for mitigation . . ." *Id.* at 9 (quoting ENRD Memorandum at 4).[2] Given the narrow scope of this Court's review, *see Chevron*, 380 F. Supp. 29 at 1112-13; the United States'

---

[2] Although the ENRD Memorandum was issued on January 9, 2018, approximately six months after the consent decree was lodged, the Court credits the United States' argument that the guidance in that memorandum was developed over time and ultimately signed by the same Acting Assistant Attorney General who has authority to approve the consent decree.

assessment of the applicability of the policy to the superseded consent decree is not unreasonable.[3]

Sierra Club also argues that the United States failed in its motion for entry of the consent decree to "squarely assert" that the Third-Party Payment Policy applies to the consent decree, noting that the motion fails to justify the United States' reliance on the policy. Sierra Club Br., ECF No. 14 at 23, 26-28. However, in the motion pending before the Court, the United States states that "[b]ecause the superseded consent decree required [Harley-Davidson] to pay a non-governmental third-party organization to carry out the project, the project came within the prohibition against third party payments." Consent Decree Mot., ECF No. 7 at 29.

NRDC/CLF also argues that a robust, arms-length negotiation regarding the mitigation project could not have taken place because the Third-Party Payment Policy was issued on June 5, 2017, less than six weeks before the consent decree was filed on July 20, 2017. The United States responds that this argument is meritless because concerns about third-party payment practices

---

[3] Sierra Club also asserts that the Third-Party Payment policy "has no reasonable basis in the Clean Air Act, or any other law or policy." Sierra Club Br., ECF No. 14 at 28. The United States responds—and the Court agrees—that the Attorney General has the authority to supervise and direct the litigation of the United States. 28 U.S.C. §§ 516, 519. Moreover, the policy is not inconsistent with the CAA because it prohibits third-party payments, not mitigation.

in settlements was identified as a concern when new leadership
joined the Department of Justice in 2017 and that "confidential
discussions [with Harley-Davidson] took place over several
months." Resp., ECF No. 16 at 11. The Court finds the United
States' explanation to be reasonable.

Regarding the substantive fairness of the consent decree,
the Court considers whether Harley-Davidson is being held
accountable and pays for the harm it allegedly caused. *Cannons
Eng'g Corp.*, 899 F.2d at 87. Sierra Club questions the
substantive fairness of the decree because in removing the
mitigation project, "[t]he United States voluntarily abandoned a
substantial public benefit, without gaining *any* corresponding
substantive or procedural return." Sierra Club Br., ECF No. 14
at 11. Sierra Club also argues that the $12 million penalty is
inconsistent with EPA's penalty policy and does not recoup the
economic benefit Harley-Davidson gained as a result of selling
the illegal Tuners. *Id*. at 16-20. NRDC/CLF argues that the
"[c]onsent [d]ecree is not substantively fair because it does
not require Harley-Davidson to offset the harm for which it is
legally responsible" since it no longer contains the mitigation
project. NRDC/CLF Br., ECF No. 15 at 15.

The United States responds that there was no objection to
the $12 million penalty as being inadequate before the
mitigation project was removed, and that commenters are wrong to

20

suggest that the penalty is inadequate now that the $3 million mitigation project has been removed because mitigation is not a penalty. Consent Decree Mot., ECF No. 7 at 21-22. The United States further responds that CAA settlements do not require the inclusion of mitigation projects. Resp., ECF No. 16 at 5.

Pursuant to the narrow scope of the Court's review, the Court is persuaded that the consent decree is substantively fair. Harley-Davidson has agreed to stop selling the illegal tuners, it has agreed to a comprehensive compliance program, and the penalty is commensurate with other mobile source settlements, here amounting to "the largest civil penalty ever obtained for the unlawful sale of aftermarket defeat devices." Resp., ECF No. 16 at 3-5. The Court is persuaded that the removal of the mitigation project does not make the civil penalty inadequate. And because mitigation is not a required element of a CAA settlement agreement, the Court is not persuaded that the removal of the mitigation project renders the consent decree substantively unfair. The Court is unpersuaded by Sierra Club's argument that the United States "voluntarily abandoned" the mitigation project. Rather, the United States determined that the mitigation project was inconsistent with the Third-Party Payment Policy. The adoption of that policy clearly put the United States at a bargaining disadvantage when it sought to renegotiate the mitigation project, but the Court

cannot find that this renders the consent decree substantively unfair.

Accordingly, for all these reasons, the Court finds that the consent decree is fair.

### B. The Consent Decree is Reasonable

"'In examining the reasonableness of a decree there are three factors for the Court to consider: (1) whether the decree is technically adequate to accomplish the goal of cleaning the environment, (2) whether it will sufficiently compensate the public for the costs of the remedial measures, and (3) whether it reflects the relative strength or weakness of the government's case against the environmental offender.'" *District of Columbia*, 933 F. Supp. at 50 (quoting *Telluride,* 849 F. Supp. at 1402). "'[T]he court must determine whether the proposed consent decree is reasonable from an objective point of view.'" *Appalachian Voices v. McCarthy*, 38 F. Supp. 3d 52, 56 (D.D.C. 2014) (quoting *Environmental Defense v. Leavitt*, 329 F. Supp. 2d 55, 71 (D.D.C. 2004)).

The United States argues that the first factor has been met because: (1) "it brings [Harley Davidson] into compliance with the CAA . . . ensur[ing] that motorcycles with Harley-Davidson tuning products meet applicable emissions standards;" (2) "decreases the likelihood that Harley-Davidson's illegal Tuners will be sold in the United States; (3) "discourage[s] motorcycle

owners from tampering with their motorcycles;" and (4) "ensures Harley-Davidson's future compliance with the CAA". Consent Decree Mot., ECF No. 7 at 18.

The United States argues that the second factor has been met because: (1) the civil penalty of $12 million was negotiated in good faith as part of the overall settlement; (2) the government considered the applicable statutory penalty factors of "[a] the gravity of the violation, [b] the economic benefit or savings (if any) resulting from the violation, [c] the size of the violator's business, [d] the violator's history of compliance with this subchapter, [e] action taken to remedy the violation, [f] the effect of the penalty on the violator's ability to continue in business, and [g] such other matters as justice may require," 42 U.S.C. 7524(b); (3) Harley-Davidson's cooperation; and (4) the risks of litigation. Consent Decree Mot., ECF No. 7 at 21.

The United States argues that the third factor has been met because: (1) while it "believes its case on liability is strong . . . Harley-Davidson ha[s] arguments why they believe they would prevail in litigation;" (2) "there is uncertainty concerning how the Court would analyze the various factors that go into determining the penalty; and (3) even if the government's case is strong, litigation would still take a

number of years and significant discovery would be necessary."
*Id.* at 25.

SLG disputes that factors (1) and (2) have been met because
of the removal of the mitigation project. SLG Br., ECF No. 12 at
17-18. NRDC/CLF argues that these factors have not been met
because the removal of the mitigation project means that there
will be no attempt to "restore the *status quo* by avoiding
additional air pollution of the same type that occurred as a
result of Harley-Davidson's violations." NRDC/CLF Br., ECF no.
15 at 16.

SLG makes three additional arguments that it contends
weighs against a finding of reasonableness. First, that the
consent decree reduces the original $15 million by 20% because
of the removal of the $3 million mitigation project. *Id.* at 18.
Second "because it does not include the $3 million mitigation
project, which the parties, based on good faith arms-length
negotiations and the strengths and weaknesses of the
government's case, had included in the original Consent Decree,
or an equivalent substitute for the mitigation project." *Id.* at
23. Third, because the sole mitigation project in the decree was
removed and not replaced with a reasonably equivalent
substitute. SLG Br., ECF No. 12 at 19.[4]

---

[4] In a footnote, SLG also suggests that it was inappropriate for
the United States to revise the consent decree based on the

24

The United States points out that mitigation is not a required element of a CAA settlement, Consent Decree Mot., ECF No. 7 at 19; that there was no objection to the $12 million penalty as being inadequate before the mitigation project was removed, and that commenters are wrong to suggest that the penalty is inadequate now that the $3 million mitigation project has been removed because mitigation is not a penalty. *Id*. at 21-22.

The Court's role is to assess whether the consent decree is reasonable from an objective point of view. *Appalachian Voices*, 38 F. Supp. 3d at 56. On this record, it appears that the consent decree is technically adequate to accomplish the goal of cleaning the environment. The decree brings Harley-Davidson into compliance with the CAA and ensures its future compliance with the CAA. Furthermore, the decree decreases the likelihood that the illegal tuners will be sold in the United States and discourages motorcycle owners from tampering with their motorcycles.

As to "whether [the consent decree] will sufficiently compensate the public for the costs of the remedial measures," *District of Columbia*, 933 F. Supp. at 50; the $12 million civil

---

Third-Party Payment Policy rather than in response to public comment. SLG Br., ECF No. 12 at 19 n.4. However, the parties may agree to modify a consent decree before the Court approves it as an order of the court.

penalty was negotiated in good faith taking into account applicable statutory factors as well as Harley-Davidson's cooperation and the risks of litigation. The penalty is commensurate with other mobile source settlements. The removal of the mitigation project from the consent decree does not change this analysis because mitigation is an element of injunctive relief rather than a civil penalty.

The final factor in the reasonableness inquiry is "whether [the consent decree] reflects the relative strength or weakness of the government's case against the environmental offender." *District of Columbia*, 933 F. Supp. at 50. SLG complains that the United States has "offered only generalities regarding the strengths and weaknesses of its case." SLG Br., ECF No. 12 at 16. However, "[i]t is almost axiomatic that voluntary compliance on an issue where there is a potential disagreement is a better alternative than the uncertainty of litigation over that issue." *District of Columbia*, 933 F. Supp. at 51. SLG also argues that the consent decree is "*a fortiori*, unreasonable given the absence of any change in the strength of the Government's case." SLG Br., ECF No. 12 at 17. This argument is unpersuasive. A consent decree naturally embodies compromise. In this case, after the superseded consent decree was lodged, but before the United States sought approval of the Court, the Third-Payment Policy, which affected a provision of the parties' agreement,

went into effect. Although this negatively impacted the United
States' bargaining position when it sought to renegotiate the
mitigation project, that does not result in a finding that the
decree is unreasonable.

Accordingly, for all of these reasons, the Court finds that
the consent decree is reasonable.

### C. The Consent Decree is in the Public Interest

"A settlement agreement which seeks to enforce a statute must
be consistent with the public objectives sought to be attained
by Congress." *Stewart v. Rubin*, 948 F. Supp. 1077, 1087 (D.D.C.
1996). The purpose of the CAA is "to protect and enhance the
quality of the Nation's air resources so as to promote the
public health and welfare and the productive capacity of its
population." 42 U.S.C. § 7401(b)(1). The Court's inquiry is
limited. "[P]rior to approving a consent decree a court must
satisfy itself of the settlement's 'overall fairness to
beneficiaries and consistency with the public interest.'" *United
States v. Trucking Employers, Inc*., 561 F.2d 313, 317 (D.C. Cir.
1977) (quoting *United States v. Allegheny-Ludlum Industries*, 517
F.2d 826, 850 (5th Cir. 1975)). "' [T]he [district] court's
function is not to determine whether the resulting array of
rights and liabilities is the one that will *best* serve society,
but only to confirm that the resulting settlement is within the
*reaches* of the public interest.'" *United States v. Microsoft*

27

*Corp.*, 563 F.3d 1448, 1460 (D.C. Cir. 1995) (quoting *United States v. Western Elec. Co.*, 900 F.2d 283, 325 (D.C. Cir. 1990)).

The government argues that the consent decree serves the public interest because it: (1) "furthers the Congressional goals embodied in the Clean Air Act. By requiring Harley-Davidson to cease the sale of uncertified motorcycles and illegal Tuners, the settlement protects air quality and promotes public health and welfare without litigation delays or costs;" and (2) "send[s] a clear deterrent signal to the industry that the Clean Air Act's mobile source emission standards and defeat device prohibitions will be vigorously enforced." Consent Decree Mot., ECF No. 7 at 27.

SLG disputes that the Consent Decree is in the public interest because the mitigation project was eliminated, arguing that since the mitigation project that was included in the superseded consent decree served the purposes of the CAA, the removal of the mitigation project or an appropriate equivalent "deprives the public of the benefits of the mitigation project." SLG Br., ECF No. 12 at 23-24. Similarly, NRDC/CLF argues that without the mitigation project, the injuries caused by Harley-Davidson's alleged violations will not be directly addressed. NRDC/CLF Br., ECF No. 15 at 17.

Sierra Club argues that the consent decree is not fair, reasonable, adequate, or in the public interest because it contains neither a buyback provision nor the mitigation project, both of which would have mitigated the alleged excess emissions. Sierra Club Br., ECF No. 14 at 13. Sierra Club also argues that the United States has not explained why the penalty provision provides a fair and reasonable resolution of the alleged violations given that the mitigation project has been eliminated. *Id.* at 16.

The United States responds that the various arguments that the removal of the mitigation project diminishes the public interest conceives of the public interest as too narrow, and that the injunctive relief secured by the decree combined with "the largest civil penalty ever obtained for the unlawful sale of aftermarket defeat devices" satisfy the fair, reasonableness and public interest standards for Court approval of the decree. Resp., ECF No. 16 at 3-5.

The Court is satisfied with the decree's "overall fairness to beneficiaries and consistency with the public interest." *Trucking Employers, Inc.*, 561 F.2d at 317 (citations omitted). The settlement protects air quality and promotes public health and welfare by requiring Harley-Davidson to cease the sale of aftermarket products that contain defeat devices, to disincentivize their continued use, and to confirm its

compliance with what it has agreed to. Given that the decree
contains "the largest civil penalty ever obtained for the
unlawful sale of aftermarket defeat devices," it sends a strong
deterrence signal. And while the superseded decree containing
the mitigation project might have been the "best" resolution of
Harley-Davidson's alleged violations, the Court cannot say that
the decree lodged before the Court is not within "the reaches of
the public interest." *Microsoft Corp.*, 563 F.3d at 1460.

Furthermore, the United States has provided a consistent
and reasonable explanation for its decision to renegotiate the
decree following the announcement of the Third-Party Payment
Policy. The adoption of that policy negatively impacted the
United States' bargaining position when it sought to renegotiate
that aspect of the consent decree. SLG requests that the Court
decline to enter the consent decree and "advise[] the parties
that it will not provide its approval unless the parties lodge a
modified agreement that includes the mitigation project or a
substantially equivalent project." SLG Br., ECF No. 12 at 24.
The Court declines to do so. *See Akzo Coatings of America, Inc.*,
949 F.2d at 1435 (the Court "may not modify but only approve or
reject a consent decree"). As my colleague, Judge Tanya S.
Chutkan recently reasoned when declining to require the United
States to renegotiate a proposed consent decree so that it could
include a project not included in the proposed decree, "[i]t

30

would not benefit the public to jeopardize this agreement and potentially mire the government and Defendants in lengthy litigation with unpredictable results, while simultaneously delaying the implementation of corrective measures." *Hyundai Motor Co.*, 77 F. Supp. 3d at 2015.

## IV.  Conclusion

The Court is sympathetic to amici's preference for the substitute consent decree over the one lodged before the Court. However, this Court is to give "broad deference . . . to EPA's expertise in determining an appropriate settlement and to the voluntary agreement of the parties in proposing the settlement." *Microsoft Corp.*, 56 F.3d at 1462 (citing *In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 118 (2d Cir. 1992)). Moreover, the Court cannot "substitute its judgment for that of the parties to the decree." *Akzo Coatings of America, Inc.*, 949 F.2d at 1435. And the Court cannot say that the consent decree lodged with the Court "appears to make a mockery of judicial power." *Microsoft Corp.*, 56 F.3d at 1462.

Accordingly, for the reasons explained above, the Motion to Enter Consent Decree is **GRANTED**. A signed Order Entering Consent Decree and the Consent Decree accompanies this Memorandum Opinion.

**SO ORDERED.**

Signed:     **Emmet G. Sullivan**
            **United States District Judge**
            **September 14, 2020**